# IN THE COURT OF APPEALS OF IOWA

No. 22-1181
Filed October 19, 2022

**IN THE INTEREST OF L.B., L.H., A.H., and S.H.,**
**Minor Children,**

**A.H., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Clinton County, Kimberly K. Shepherd, District Associate Judge.

The mother appeals the termination of her parental rights to four of her children. **AFFIRMED.**

Taryn R. McCarthy of Clemens, Walters, Conlon, Runde & Hiatt, L.L.P., Dubuque, for appellant mother.

Thomas J. Miller, Attorney General, and Dion D. Trowers, Assistant Attorney General, for appellee State.

Rebecca Sharpe, Bettendorf, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

The mother appeals the termination of her parental rights to four[1] of her children: S.H. and A.H., born in 2015; L.H., born in 2016; and L.B., born in 2019.[2] The juvenile court terminated the mother's parental rights to all four children under paragraphs (d) and (e) of Iowa Code section 232.116(1) (2022); it also terminated her rights to S.H., A.H., and L.H. under paragraph (f) and to L.B under paragraph (h). The mother challenges the grounds for termination, asserts the loss of her rights is not in the children's best interests, and urges us to apply an exception to termination to save the parent-child relationships. In the alternative, she requests additional time to work toward reunification or that the children be placed in a guardianship with their maternal great-grandparents while she maintains her parental rights.

We review termination proceedings de novo. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012).

We begin by reviewing the grounds for termination; we may affirm on any ground we find supported by clear and convincing evidence in the record. *Id.* at 774. We choose to review termination under paragraphs (f) and (h), which require proof of several elements including proof the children cannot be returned to the

---

[1] The mother has a daughter who was removed from her care while the family still lived in Michigan—before they moved to Iowa in 2020—and was placed with her father. That daughter is not at issue here. Additionally, the mother's sixth child was born in late 2021; the mother maintained custody of that child as of the time of the termination trial in May 2022.

[2] The fathers of the children were also involved in termination proceedings, but those cases were separate from the termination trial involving the mother. No father is a party to this appeal.

parent's custody at the time of the termination trial. *See* Iowa Code § 232.116(1)(f)(4), (h)(4); *see also In re D.W.*, 791 N.W.2d 703, 710 (Iowa 2010).

According to the family's social worker, this family has a history of "lack of stable housing, lack of consistent employment, domestic violence, and dependent relationships." These issues were present when the family lived in Michigan, and the children were removed from the mother's care by the Michigan-equivalent of DHHS[3] as a result. The last of the returned-children came back into the mother's care in June 2020,[4] and the family moved to Iowa shortly after. DHHS became involved with the family in December 2020. DHHS's initial concerns involved allegations the mother physically abused one of the children[5] and that she had turned a door handle around and was locking the four children in a bedroom. After interacting with the family, DHHS became further concerned the mother had unaddressed mental-health needs and that the family was experiencing housing instability. The children were initially placed in the care of a relative with the mother's agreement, but the mother did not cooperate with services and refused to sign a safety plan, so the children were formally removed from the mother's care in February 2021.

---

[3] In 2022, the Iowa legislature merged the department of human services with the department of public health into the Iowa Department of Health and Human Services (DHHS), with the transition starting July 1, 2022. *See* 2022 Iowa Acts ch. 1131 § 51.

[4] The daughter who was removed and then placed in the care of her father was never returned to the mother. The other children were returned in stages—not all at once.

[5] DHHS issued a founded child abuse report, which concluded the mother caused bruising on one of the children by spanking them.

The children remained outside of the mother's care from February 2021 through the time of the termination trial in May 2022. During those approximately fifteen months, little progress was made. The mother did not address her mental health, as she said she found therapy triggering.[6] The mother and her paramour rented a three-bedroom apartment along with the paramour's mother about one month before the termination trial, which is a positive, but it was also the sixth or seventh place the mother lived during the fifteen months. The mother testified the four children would be able to share the third bedroom with the use of two sets of bunk beds, but she did not yet have any beds for the children at the time of the termination trial. The mother's fully supervised visits with the children were described as chaotic and a "free-for-all," with the mother generally unable to manage or redirect the children. This sometimes led the children to placing themselves in dangerous situations—such as trying to ride a toy down the stairs—and left the mother overwhelmed, yelling and cursing at the children. The social worker contrasted these situations to times she saw the children in the home of their great-grandparents—with whom they have been living since July 2020—

---

[6] The mother has a long history of trauma. She spent time in a foster care as a child, has been the victim of domestic violence in her romantic relationships, and had a non-fatal suicide attempt in 2019.

She reported completing a number of psychological evaluations before DHHS's involvement and told workers she had been diagnosed with depression, post-traumatic stress disorder, and anxiety. But, when asked, the mother refused to sign releases allowing DHHS to access any previous evaluations. In a report to the court, the social worker noted the mother "frequently displays erratic behaviors and angry outbursts of screaming at others when she disagrees with them."

In June 2021, the mother went for an intake interview with mental-health services; the therapist-evaluator stated the mother would be "discharged when she has increased her overall coping skills and has begun to process past trauma." The mother attended a few therapy sessions but quit attending by November 2021, self-reporting she had no current mental-health concerns.

stating the children's behaviors are "starkly different" and the "children are manageable" when they are with their great-grandparents. The social worker testified:

> I don't think the issues have been resolved that would keep the children safe. I have concerns about long-term stability, follow-through, identifying significant needs that [the mother] would have which would include the mental health piece, participating in her children's activities such as doctor appointments, therapy appointments, things like that, being able to keep them on a schedule. [The mother] even struggles at this point with her interaction with the children in trying to remain calm. During that time she often raises her voice. She also swears, and services have been in place over a year and that pattern still continues. My concern with that being is it appeared she was frustrated and overwhelmed at the beginning of the onset of the case, but the child abuse assessment— and children were locked in the room and neglected and my worry would be that would happen again, seeing how the interactions occurred now that that behavior on her part hasn't changed.

While the mother recently obtained housing and employment, we cannot say the mother could resume parenting the children at the time of the termination trial. The mother had not worked on her mental health, she did not display improved parenting abilities, and the children would not have anywhere to sleep in the mother's home. *See In Z.P.*, 948 N.W.2d 518, 524–25 (Iowa 2020) (affirming termination of parental rights when father could not begin caring for child because the father "did not have a sleeping arrangement suitable for a toddler" and "had not made the necessary progress to serve as a safe home for the young child"); *In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (upholding termination of mother's parental rights where the mother "ha[d] not progressed to the point where she can care for the child without ongoing assistance"). The State proved the grounds for termination under paragraphs (f) and (h).

Next, the mother argues termination of her rights is not in the children's best interests. *See* Iowa Code § 232.116(2). Since 2016, the mother has been involved with the equivalent of DHHS in three states: Florida, Michigan, and Iowa. Despite years of services off and on, the mother continues to struggle with properly supervising and caring for her children. In contrast, the social worker testified that since the children were placed in the care of their great-grandparents, "the children have made pretty remarkable improvement. They have become calmer. They are showing improvement in school; behaviors have decreased. When they are in their [great-grandparents'] care, they listen and follow directions." The great-grandparents have been referred for an adoptive home study and, according to the social worker, they have expressed their intention and willingness to "do what they need to do to keep the children in their care." *See id.* § 232.116(2)(b) (considering whether the foster family "is able and willing to permanently integrate the child into the foster family" as part of the best-interests determination). Termination of the mother's parental rights is in the children's best interests.

The mother asserts a permissive factor should be applied to save her relationships with her children, arguing the children would be detrimentally affected by the loss of her rights because of the close bond she shares with each child, *see id.* § 232.116(3)(c), and arguing termination was unnecessary because the children were in the care of their great-grandparents, *see id.* § 232.116(3)(a). As a parent requesting an exception to termination, the mother bears the burden to convince us to use our discretion in favor of an exception. *See A.S.*, 906 N.W.2d at 475–76. The great-grandparents were caring for the mother's children, but DHHS—not the great-grandparents—maintained the legal custody of the children,

so section 232.116(3)(a) is not applicable. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014). And, other than testifying the termination of her rights would "destroy [her] children," the mother offered no evidence to establish the children would be disadvantaged by the termination such that it overcomes the mother's inability to provide them a safe, stable home. *See D.W.*, 791 N.W.2d at 709. The application of section 232.116(3)(c) is not warranted here.

Alternatively, even if termination was proper, the mother asks for additional time to work toward reunification. Iowa Code section 232.104(2)(b) allows the court to delay permanency six months if the parent will be able to resume parenting by the end of that time. But the mother's testimony at the termination trial showed that she is either not willing or able to understand her role in DHHS's and the juvenile court's involvement with her family. As the juvenile court stated in its termination order:

> [T]he mother, expressed blame toward [DHHS] and the "system" for "hounding her." She indicated that she believes the reason the court is involved with her children is because of the housing issues of the family. The mother did not acknowledge that her actions had any part in the court involvement with this family. The mother did not understand why the lack of stability in the lives of her children was a problem, despite the fact that she recognizes how significantly the behavior of her children has improved since stability was introduced into their lives. . . . The mother has repeatedly resisted any services regarding counseling, however, the mother has not taken any steps on her own to address her mental health and the trauma she has experience through years of domestic violence.

When asked by her attorney what she needed to do if she was given more time to reunify with the children, the mother testified, "Maintain housing, and from my personal viewing that's pretty much all that I feel like we need. That's all we need to do is maintain housing." Without recognizing the work that still needs to be

done, we cannot say the mother will make the necessary changes if given a short extension.

Finally, the mother asks that, rather than termination of her parental rights, the children be placed in a guardianship with the great-grandparents. *See* Iowa Code §§ 232.117(5) (allowing the court to not terminate but instead enter a permanency order); 232.104(2)(d)(1) (allowing the court to "[t]ransfer guardianship and custody of the child to a suitable person"). But before the court can order such a guardianship, it must conclude that termination of the parent's rights is not in the children's best interests. *See id.* § 232.104(4)(a). And we have already concluded termination is in these children's best interests. Plus, the social worker testified that a guardianship was considered in this case but was ultimately not recommended by DHHS because the "[great-]grandparents' income is limited, and that a guardianship would not provide them any kind of subsidy [so] it would be difficult for them to—as the children continued to grow and have needs, to be able to afford to raise them on [the great-grandparents'] limited income."

We affirm the termination of the mother's parental rights to these four children.

**AFFIRMED.**